482 A.2d 1294

**COMMONWEALTH of Pennsylvania**

v.

**George BRITTON, Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 3, 1984.

Filed Oct. 12, 1984.

Petition for Allowance of Appeal Granted Feb. 14, 1985.

204

206

John Packel, Chief, Appeals, Assistant Public Defender, Philadelphia, for appellant.

Jane C. Greenspan, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before SPAETH, President Judge, and WICKERSHAM, BROSKY, CIRILLO, BECK, POPOVICH and HESTER, JJ., en banc.

BECK, Judge:

Appellant was convicted of rape, robbery, burglary, and simple assault.[1] His post verdict motions were denied and he was sentenced to ten to twenty years for rape, ten to twenty years for robbery, and ten to twenty years for burglary, to be served consecutively. Sentence was suspended on the simple assault bill. His direct appeal from

1. 18 Pa.C.S. §§ 3121, 3701, 3502, 2701.

the judgment of sentence is now before this court. We affirm the judgment of the trial court.[2]

The Commonwealth produced evidence at trial that appellant entered the home of the victim, punched and robbed her, and forced her to submit to sexual intercourse. The appellant's defense was based on misidentification and alibi.

Among other challenges to the conduct of the trial, appellant contends that the trial judge assumed the role of advocate for the Commonwealth. He asserts that the judge's extensive and biased questioning of witnesses exhibited prejudice against him and denied him a fair trial. We disagree.

The standards guiding a judge in interrogating witnesses during trial are well established. Our Supreme Court in *Commonwealth v. Myma*, 278 Pa. 505, 507–508, 123 A. 486, 487 (1924) ruled:

> A judge in a jury trial has a right to interrogate witnesses. It sometimes becomes his duty to do so, even to the point of recalling a witness to supply an omission of proof on a material point: *Boggs v. Jewell Tea Co.*, 266 Pa. 428, 434 [106 A. 781]; *State v. Jackson*, 87 S.C. 407, 69 S.E. 883; *Lycan v. People*, 107 Ill. 423. But a judge may so conduct an examination as to make it an abuse of discretion, requiring a new trial.
>
> Witnesses should be interrogated by the judge only when he conceives the interest of justice so requires. It is better to permit counsel to bring out the evidence and clear up disputed points on cross-examination unaided by the court; but where an important fact is indefinite or a disputed point needs to be clarified, the court may see that it is done by taking part in the examination ... Judges should refrain from extended examination of witnesses; they should not, during the trial, indicate an opinion on the merits, a doubt as to the witnesses's credibility, or do anything to indicate a leaning to one side

---

2. We affirm the trial court with the exception of its imposition of maximum sentence on the robbery conviction. We have modified the sentence for robbery in accordance with 18 Pa.C.S. § 1103(2). See at p. 222.

or the other, without explaining to the jury that all these matters are for them.

*Accord, Commonwealth v. Seabrook,* 475 Pa. 38, 379 A.2d 564 (1977); *Commonwealth v. Brown,* 438 Pa. 52, 265 A.2d 101 (1970); *Commonwealth v. Rhem,* 283 Pa.Super. 565, 424 A.2d 1345 (1980); *Commonwealth v. Toombs,* 269 Pa. Super. 256, 409 A.2d 876 (1979).

The American Bar Association's Standards Relating to the Function of the Trial Judge have further elucidated the role of the judge as interrogator.

[I]t is appropriate for him [the trial judge] from time to time to intervene in the conduct of the case. Thus, when it clearly appears to him that for one reason or another the case is not being presented intelligibly to the jury, the judge is not required to remain silent. On the contrary, he may be question to a witness elicit relevant and important facts. He may interrogate a witness after a cross-examination which appears to be misleading to the jury.... The judge should be aware that there may be greater risk of prejudice from over-intervention than from under-intervention. While he should not hesitate to exercise his authority when necessary, he should avoid trying the case for the lawyers. American Bar Association Project on Standards for Criminal Justice, *Standards Relating to the Function of the Trial Judge,* Approved Draft, 1972, Commentary, Section 1.1(a), P. 26–27. See: *Commonwealth v. Seabrook, supra* [475 Pa.] at 45, [379 A.2d at] 567.

Although the standard in these cases is well-settled, its application on appellate review is difficult because the appellate court applies the standard on a cold record.

It is impossible to record the demeanor of the judge when questions are asked by him. A hostile form of mind cannot be recorded unless the questions themselves disclose it; it is impossible to note either the inflection of the voice, the manner of the questioner, or what is generally termed the "atmosphere" of the trial.

*Commonwealth v. Myma,* supra, 278 Pa. at 510, 123 A. at 487.

In order to determine if the trial judge abused his discretion we have carefully evaluated the entire record with particular emphasis on the court's participation in questioning witnesses.

Initially, we note that the judge's opening remarks properly instructed the jury as to their role in the case; i.e. the jurors are the sole judge of the facts N.T. 52–53, and the credibility of witnesses, N.T. 54, 59. He specifically cautioned:

> Now, I may question some of the witnesses myself during the course of the trial. The questions, if I do ask them, will not reflect any opinion on my part about the evidence or about the case. My only purpose would be to inquire into matters which have not been fully explored, or matters that I think need some clarification.
>
> Again, a cautionary instruction to you, do not look to me to fill in all the little details of the case. That is not my role. I will only get involved in the questioning if it is something that I feel has not been fully explored and that is a proper area for me to get into or matters that require clarification.

N.T. 60–61.

The court repeated this cautionary instruction before questioning the victim and the appellant during the trial. N.T. 165, 446.

In its charge to the jury the court again acknowledged its limited role and the jury's proper role. The court reminded the jury:

> Again, as I said, it is your recollection of the evidence, ladies and gentlemen, both the direct and the circumstantial evidence and not mine or the lawyers on which you rely during your deliberations.
>
> You are not bound by any opinion you might think the lawyers or I have expressed concerning the guilt or innocence, credibility of witnesses, weight of evidence,

facts proven by the evidence or inferences to be drawn from the facts.

N.T. 602.

■ In a four hundred and eighty seven page trial transcript, only a small portion, twelve pages, included questions that the court posed relating to police practices. The court directed questions at certain police officers to clarify police practices for the jury. The judge asked one police officer to define the term a "forty-eight", N.T. 250; others to explain standard line-up procedures. N.T. 307, 316 and 401. The judge queried an investigating officer who had taken night-time photographs of the scene about the lighting conditions that existed when he took them. N.T. 268–269. The judge conducted this questioning in a neutral unbiased manner and clarified the subject matter under consideration. Counsel for the appellant was given an opportunity for recross-examination after the court completed its inquiry. N.T. 316. *See Commonwealth v. Lanza,* 228 Pa.Super. 300, 323 A.2d 178 (1974). The net result of this questioning was to enlighten the jury on police practices which were important for their understanding of the case.

■ The appellant especially complains about the court's questioning the victim asserting that this questioning was unnecessary and that the questions were repetitious and served to highlight testimony favorable to the Commonwealth. N.T. 156–171. On the basis of the record we cannot conclude that the judge's questions went beyond the permissible border.

The court questioned the victim about the circumstances surrounding several identifications she made of appellant. The victim and a witness positively identified the appellant at both the line-up and the preliminary hearing. The victim also identified him with certainty at trial during her direct testimony. However, a composite drawing made earlier by the police, based on the victim's and a witness' description, bore little resemblance to the appellant. N.T. 111–112; 145–149.

The victim's ability to observe her assailant during the commission of the crime was therefore crucial but was not addressed thoroughly in direct and cross-examination. After counsel had completed their examinations, the court briefly questioned the victim, first giving the jury cautionary instructions. N.T. 165.

The court asked the victim to describe the opportunities she had to observe her assailant, N.T. 166–167; and to explain her inability to adequately describe the assailant to the artist making the composite. N.T. 168. These questions themselves were neutral in content, were not protracted, and did not indicate bias. Counsel for the appellant was given the opportunity to recross-examine the victim after the court completed its questions. N.T. 170–171. Taking all these factors into consideration, we conclude that the court did not abuse its discretion in questioning the victim.

■ The appellant next contends that the judge's questioning of him was excessively extensive and indicated to the jury that the court did not believe his alibi defense. After a thorough study of the judge's examination, we conclude that the trial court did not abuse its discretion in questioning appellant.

On direct examination, the appellant gave the following testimony regarding his alibi defense:

Q. Where were you on that day, that evening?

A. You mean from the beginning of the day?

Q. From 7 o'clock in the evening on where were you that day?

A. I was around 12th and Christian for a while. Then I went to 12th and Carpenter. Then around 11th Street until about 11:30. Then I went home.

Q. Were you with anybody at any of those times?

A. Some of my friends.

Q. When did you go out to visit your friends?

A. About 5 o'clock.

Q. Were you able to bring any of those friends today in court?

A. No.

Q. Were you able to find them?

A. No.

Q. Have you been in police custody since May 11th, 1979, when Officer Berren placed you in custody?

A. Yes.

Q. So, have you been able to go out on the street and find any of your friends that you were with that night?

A. Yes.

Q. Have you been able to go out on the street and find any of those friends?

A. No.

N.T. 414–415.

The assistant district attorney cross-examined appellant regarding the details of his alibi, including the names and addresses of his friends, the amount of time they spent at each location the night of the crime, and the efforts appellant made, through his attorney, to locate these friends so that they would testify for him.

However, the question of whether his incarceration inhibited or prevented him from pursuing alibi witnesses to testify for him was not fully explored on direct, cross or redirect examination of appellant. After both counsel had completed their questioning of appellant, the court queried the appellant in general terms about his access to his attorney while he was incarcerated, to inform the jury about availability of counsel to prisoners in general and appellant in particular.

Before he began his questions, the judge issued cautionary instruction. N.T. 446. The judge, leading up to the subject of availability of communication between the appellant and his attorney, asked appellant:

BY THE COURT:

Q. I want to clarify some things with respect to these people that you mentioned and that you have known all of your life, or most of them all of your life and that you have been unable to get a hold of.

Q. Now, have you had an attorney appointed for you since the very day of your arrest?

A. Yes.

Q. And since the day of your arrest and up through and including today have you had access to an attorney at any time that you needed one to discuss and prepare this case?

A. When he comes to see me.

Q. Speak to the jury.

A. Yes.

Q. Now, when did you give your attorney the names of these people that you mentioned from the stand today that know you were with them between 7:00 and 11 o'clock on May 9th 1979? When did you give your attorney the names of those people?

A. I believe it was a couple of weeks, three, four weeks ago, I believe. I can't say exactly what day it was.

Q. Three or four weeks ago?

A. Somewhere in that vicinity.

Q. From today?

A. Yes.

Q. Is that the first time you gave your attorney the names of these people you say were with you between 7:00 and 11 o'clock that night?

A. Yes, I believe so.

Q. Had you had discussions with the attorneys that were involved in this case on your behalf prior to three weeks from today since your arrest?

A. Yes.

Q. They visited you at the prison from time to time?

A. Yes.

Q. Are you permitted to make calls from the prison?

A. You're permitted to make one call. Like it's hard to explain. I mean if you get a call at all. You know, they give you a phone call sometime. I mean it's not like you can go make a phone call.

Q. Isn't it true that you are allowed to make phone calls? You correct me if I am wrong.

A. You're allowed to make phone calls, but that don't say you going to get one.

Q. Well, you are allowed to make phone calls out, you have that right and privilege?

A. You have it, but that don't mean you're going to get it, you understand.

Q. Now, were you at any time prevented from contacting your attorneys?

A. Just like I said, Your Honor, they give you a phone call—

Q. Were you ever at any time prevented from contacting your attorneys?

A. That's what I'm trying to explain to you, how the situation is.

Q. I am familiar with it.

A. Well, no.

Q. You can explain. Go ahead.

A. They supposed to be social workers. I guess that's what they call them. You go to them with a problem. They send you to someone else. Then they send you to this person. You don't get nothing done.

He comes to see me as often as he can, and when he comes to see me I tells him my problems. Then, other than that I can't do nothing.

Q. Thank you very much for the explanation.

Since May 9th you have had an attorney appointed for you, correct?

A. Yes.

Q. And those attorneys visit the prison almost every day, don't they?

A. Those attorneys?

Q. From his office.

A. From his office?

Q. Yes.

A. I guess so. I don't know.

Q. Well, you know other people who are there who are represented by attorneys from his office?

A. Probably so.

Q. You also can write out to your attorneys at any time you want, is that correct?

A. Yes.

Q. So, my specific question to you is, to clarify this matter, were you at any time ever prevented by anyone and, if so, you give us the names, from contacting your attorneys?

A. By phone?

Q. By phone, by letter or by making a request.

A. Sure. I can give several names....

N.T. 448–456.

The dialogue recited above constitutes the essence of the interchange between the judge and the appellant although the actual dialogue covered 8 pages of transcript. N.T. 448–456. We conclude however based on the above line of questioning that the trial court did not abuse its discretion or reveal manifest bias to the jury. The content of the questions was neutral. Although repetitious the questions were not asked in a hostile, badgering or challenging manner. The appellant did not answer some of the questions directly. The court showed patience with appellant's answers and allowed him full opportunity to explain them. The questions did not show hostility toward the appellant.

In support of his position that a new trial should be granted appellant cites *Commonwealth v. Williams*, 468 Pa. 453, 364 A.2d 281 (1976); *Commonwealth v. Toombs*, 269 Pa.Super. 256, 409 A.2d 876 (1979); *Commonwealth v. Elmore*, 241 Pa.Super. 470, 362 A.2d 348 (1976); and *Commonwealth v. Ramirez*, 269 Pa.Super. 601, 410 A.2d 863 (1979). In each of these cases, the trial court's participation clearly went beyond the limits of proper questioning and each is clearly distinguishable from the case sub judice.

■ Appellant also contends that the trial court repeatedly directed critical and denigrating remarks at appellant's

counsel in front of the jury, and that these unfairly influenced the jury's opinion of appellant's case. It is axiomatic that absolute impartiality in the conduct of the trial is expected of the trial judge, as he occupies an exalted position. He is the one person to whom the jury looks for guidance, and from whom the litigants expect impartiality. *Commonwealth v. England*, 474 Pa. 1, 375 A.2d 1292 (1977); *Commonwealth v. Myma.* However,

> Every unwise or irrelevant remark made in the course of a trial by a judge, a witness, or counsel does not compel the granting of a new trial. *A new trial is required when the remark is prejudicial; that is, when it is of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial.* (Citations omitted)
>
> *Commonwealth v. Goosby*, 450 Pa. 609, 611, 301 A.2d 673, 674 (1973), quoting from *Commonwealth v. Phillips*, 183 Pa.Super. 377, 382, 132 A.2d 733, 736 (1957). See also, *Commonwealth v. Palmer*, 463 Pa. 26, 35–36, 342 A.2d 387, 392 (1975). (Emphasis in original).

We have carefully reviewed the entire record and examined those comments raised by appellant. We conclude that these comments do not require the granting of a new trial.

 Appellant contends that the court committed error when it interrupted him during his closing remarks as he (counsel) began to explain to the jury the meaning of "reasonable doubt." The court correctly curtailed the attorney's remarks explaining to the jury that it was his role to instruct as to the law. N.T. 536. It is the duty of the trial judge to instruct the jury as to the applicable law, and it is not error for the judge to interrupt counsel and correct a possibly misleading statement of the law. *Commonwealth v. Coleman*, 235 Pa.Super. 379, 341 A.2d 528 (1975).

Appellant also complains of other specific exchanges between trial counsel and the court in which he alleges that the trial judge was disrespectful or his comments showed partiality. Counsel's objections are without merit, although

the interchanges in some instances were caustic, they did not deprive appellant of a fair and impartial trial. N.T. 162, 309, 365, 452–453, 550; See: *Commonwealth v. England,* 474 Pa. at 17, 375 A.2d at 1300.

The appellant raises several additional claims relating to error made by the court.

■ Appellant contends that a mistrial should have been granted because the jury was informed of his arrest in another criminal matter. If a testimonial reference indicates to the jury that the accused was involved in unrelated criminal activity, reversible error has been committed except in certain circumstances.[3] *Commonwealth v. Nichols,* 485 Pa. 1, 400 A.2d 1281 (1979); *Commonwealth v. Fuller,* 479 Pa. 353, 388 A.2d 693 (1978); *Commonwealth v. Turner,* 454 Pa. 439, 311 A.2d 899 (1973). "[T]he controlling question is whether or not a juror could reasonably infer from the facts presented that the accused had engaged in prior criminal activity." *Commonwealth v. Allen,* 448 Pa. 177, 181, 292 A.2d 373, 375 (1972); *Commonwealth v. Irwin,* 475 Pa. 616, 381 A.2d 444 (1977).

■ Appellant was initially arrested for an unrelated matter, and was subsequently held in this case after he was identified by the victim in the line-up. Although the district attorney did question an officer about that arrest, no reference was made to the unrelated criminal activity. The only reasonable conclusion the jury could have reached from this testimony was that appellant was arrested at that time for the crime for which he was being tried. N.T. 73, 272–273.

Appellant also points to a remark made earlier by the victim, during direct examination. The victim was asked if anyone had suggested to her that her assailant would be present at the line up. She answered:

No, they just said they had picked up a suspect in a different case. N.T. 114.

---

**3.** For an explanation of those circumstances, none of which are present here, *See Commonwealth v. Nichols, supra.*

We do not believe that the jury could have concluded from this remark, which did not even refer to appellant specifically, that appellant had been involved in unrelated criminal activity.

██ In order to bolster his misidentification defense, appellant attempted to show that police officials conducting the investigation were biased against appellant and improperly motivated to solve this crime quickly. To support this, appellant attempted to introduce the testimony of two reporters for the *Welcomat* newspaper. They would have testified that sources at the Philadelphia Police Department's Central Detective's office intentionally and untruthfully told them that appellant had committed another rape in center city Philadelphia. The reporters did not know the names of their sources. We conclude that the trial court properly excluded this testimony as irrelevant and as hearsay. See: *Commonwealth v. McCusker*, 448 Pa. 382, 292 A.2d 286 (1972); *Commonwealth v. Krajci*, 283 Pa.Super. 488, 424 A.2d 914 (1981).

██ The appellant also claims it was error for the trial court to refuse to allow him to call two witnesses for the purpose of introducing prior inconsistent statements of one of the defense witnesses. Counsel did not plead surprise at trial. The in-court statements of the witness he sought to impeach were not inconsistent with those he attempted to introduce, but were merely not as favorable to the appellant as he might have preferred. Considering the factors outlined in *Commonwealth v. Waller*, 498 Pa. 33, 444 A.2d 653 (1982), the court did not abuse its discretion in this regard.

██ The appellant alleges that the court committed reversible error in defining reasonable doubt in its charge:

It is not a mere hesitation. A mere hesitation in and of itself is not a reasonable doubt. But a hesitation concerning the guilt of the defendant may become a reasonable doubt when and if that hesitation becomes a restraint and would then cause you to be restrained from acting in a matter of the highest importance in your own life.

N.T. 641.

Appellant contends that this constituted reversible error as the Supreme Court has defined reasonable doubt as a doubt that would cause "hesitation" in matters of the highest importance. Formulations of reasonable doubt using "hesitate" and "restraint" have both been approved by the Supreme Court. *Commonwealth v. Young*, 456 Pa. 102, 317 A.2d 258 (1974). This court has held that a trial court may properly choose one and explicitly reject the other in its instructions to the jury. *Commonwealth v. Moore*, 271 Pa.Super. 494, 414 A.2d 362 (1979). Affording the trial court this choice is not error. It is not at all clear that one instruction is more favorable to the accused than the other. *Commonwealth v. Boone*, 287 Pa.Super. 1, 429 A.2d 689 (1981). Therefore appellant's claim is meritless.

█ Appellant also claims that a new trial should be granted because the trial court allowed the assistant district attorney to cross-examine him by using an out of court statement of another party. N.T. 439–440. Clearly this statement was hearsay and was not admissible as substantive evidence, or for the purpose of impeaching credibility. *Commonwealth v. Baez*, 494 Pa. 388, 431 A.2d 909 (1981). However, the trial court's clear and proper curative instruction was sufficient, and we conclude that the trial court did not commit reversible error. See: *Commonwealth v. Hill*, 237 Pa.Super. 543, 353 A.2d 870, 879 (1975).

█ The trial court properly instructed the jury regarding the adverse inference that may be drawn in certain circumstances if witnesses are not called. In so doing, the court used several examples from the evidence that had been presented. Appellant alleges that the trial court erred when it explained that a potential witness, who had seen the line up but was unable to identify him, was available to both sides, and no adverse inference should be drawn from the Commonwealth's failure to produce her at trial. We find no error in this instruction as it was an appropriate example

and a correct statement of the law. *Commonwealth v. Brown,* 267 Pa.Super. 530, 407 A.2d 36 (1979).

██ Neither was reversible error committed when the court permitted the assistant district attorney to argue from a statement which had been read into evidence, although she inadvertantly added a word. After appellant's objection, the court properly instructed the jury that its own recollection of the testimony was controlling, not that of counsel. See: *Commonwealth v. Mathis,* 227 Pa.Super. 464, 324 A.2d 407 (1974).

██ We also conclude that appellant's allegation that a new trial is required for prosecutorial misconduct in closing argument is without merit. Although the remarks regarding appellant's trial strategy were improper, *Commonwealth v. Collins,* 462 Pa. 495, 341 A.2d 492 (1975), the trial court immediately sustained appellant's objection and properly and adequately instructed the jury to disregard those remarks.

██ Appellant also argues without merit that the trial court erred in refusing his request to charge the jury on robbery under 18 Pa.C.S.A. 3701(a)(v), (third degree felony) as well as 18 Pa.C.S.A. 3701(a)(iv) (second degree felony). A trial court need not instruct the jury on a lesser offense unless there is support for that instruction in the evidence. *Commonwealth v. Franklin,* 248 Pa.Super. 145, 374 A.2d 1360 (1977); *Commonwealth v. Melnyczenko,* 238 Pa.Super. 203, 358 A.2d 98 (1976); *accord, Commonwealth v. White,* 490 Pa. 179, 415 A.2d 399 (1980). Under the evidence presented in this case, the trial court's refusal of appellant's proposed instruction was proper.

██ Finally appellant has asserted that the court erred by imposing an illegal sentence on the robbery bill. Although this issue was not raised below, it is well-settled that the illegality of a sentence is not a waivable matter. *Commonwealth v. Norris,* 498 Pa. 308, 446 A.2d 246 (1982); *Commonwealth v. Fulton,* 315 Pa.Super. 420, 462 A.2d 265 (1983). We agree that the sentence imposed was illegal.

222

■ The trial court charged the jury only on robbery as provided by 18 Pa.C.S.A. § 3701(a)(iv). This is a felony of the second degree. 18 Pa.C.S.A. § 3701(b). The maximum sentence for a felony of the second degree as provided by 18 P.S.A. § 1103(2) is not more than ten years. Therefore, the sentence of ten to twenty years imposed by the trial court exceeded the statutory maximum and was illegal.

■ Once it has determined that a sentence is illegal, this court may either remand for resentencing or vacate and amend the sentence directly. *Commonwealth v. Ford*, 315 Pa.Super. 281, 461 A.2d 1281 (1983). The trial court sentenced appellant to the maximum time permissible on all the bills for which he was sentenced. The court also provided that these sentences were to be served consecutively, and explained its reasons on the record at sentencing N.T. 3/18/80, 22–28. The court clearly intended that appellant serve the maximum permissible period of incarceration. Therefore we are not substituting our judgment for that of the trial court by amending appellant's sentence on the robbery bill to the statutory maximum, five to ten years, to be served consecutively to his sentences on the other two bills for which he was sentenced. See: *Commonwealth v. Lovett*, 218 Pa.Super. 201, 275 A.2d 835 (1971).

As Amended, the Judgment of Sentence is Affirmed.

POPOVICH, J., dissented.

SPAETH, President Judge, filed dissenting opinion.

BROSKY, J., joined in SPAETH's, President Judge, dissenting opinion.

SPAETH, President Judge, dissenting:

I believe that the trial judge's questioning of appellant constituted an abuse of discretion, and that the judgment of sentence should be reversed and the case remanded for a new trial.

Appellant's defense was alibi and misidentification. On direct examination he testified that on the evening of the

crime he was with some of his friends: "I was around 12th and Christian for a while. Then I went to 12th and Carpenter. Then around 11th Street until about 11:30. Then I went home." *Id.* Appellant's testimony implied that he was not able to bring any of these friends to court to testify in his defense because he had been in custody since his arrest and had not been able to go out and find any of the friends that he was with that night. *Id.* On cross-examination the assistant district attorney questioned appellant extensively regarding the identifies of the friends he had been with that night and the efforts that he and his attorney had made to locate them. N.T. 423–37. Nevertheless, the trial judge then also proceeded to question appellant extensively regarding appellant's efforts and ability to locate these friends through the use of his attorney while he was in prison. N.T. 448–456.

The majority quotes at pages 213 through 216 of its opinion approximately four pages of the judge's questioning of appellant and states that this constitutes "the essence of the interchange." Majority Op. at 216. However, the judge's questioning covered approximately eight pages of the trial transcript, and it is necessary to consider all of it in order to determine whether the judge abused his discretion. The judge's questioning continued, after the questions quoted by the majority, as follows:

A. Sure. I can give you several names.

MR. BACHMANN: Objection Your Honor.

THE COURT: Objection to what?

MR. BACHMANN: Your Honor's question.

THE COURT: Overruled.

MR. BACHMANN: Sidebar?

THE COURT: Not necessary.

MR. BACHMANN: *Commonwealth vs. To[o]mbs,* Your Honor.

THE COURT: This is *Commonwealth v. Britton.*

MR. BACHMANN: I am aware, Judge.

THE COURT: Fine. I don't think we need to throw out cases in front of the jury after I have denied your request for sidebar, do you understand that?

MR. BACHMANN: Yes, Your Honor. May I re-ask my request for sidebar, Your Honor?

THE COURT: Denied.

BY THE COURT:

Q. You have been in the Philadelphia Detention Center Since May 9th, this is what I am trying to clear up, and during that time you have had opportunities to discuss the case? You can answer that yes or no and then you can explain. Because we are not getting the yes or no answers, we are getting the explanations. I really do need to clarify something, and if there is anything you do not understand just stop me there. You have worked with your attorneys in the preparation of this case, is that a correct statement?

A. Yes.

Q. You told the jury, as I understand it, that you first gave the names of these people to your attorney three weeks ago?

A. Somewhere around there.

Q. Did you give him the addresses of these people?

A. No.

Q. Have you ever visited their homes, these people you have known all your life?

A. They're my age, 22, 23.

Q. Have you ever visited their homes?

A. Some of them.

Q. Now, did you give your attorney the addresses of those people whose homes you visited that you have known all your life?

A. No, sir.

Q. Why not?

A. Because I was incarcerated. And when I came home, people move, and people don't usually give you

their addresses. I mean you see them but they don't usually, you know give up their addresses.

Q. Mr. Britton, what I am trying to clarify here—

MR. BACHMANN: Request for sidebar, Your Honor?

THE COURT: Denied.

BY THE COURT:

Q. What I am trying to clarify, Mr. Britton, is I thought I understood you to say that you knew these people all your life, you knew their addresses. I am asking you did you give those addresses to your attorney?

A. No.

Q. Why not?

A. Because I didn't have but maybe one dude that I knew the address. That's about it.

Q. Did you give him that address?

A. No.

Q. What day did you get out of this hospital or leave?

A. March something, 1st, 2nd, 3rd.

Q. I think maybe you are confused. I think you said April earlier.

A. Yes, April.

Q. I don't want you to make a mistake.

Sometime in April?

A. Yes, I believe so. In April, somewhere in that vicinity.

THE COURT: No further questions.

Do you have any questions as a result of the Court's questions, counsel?

MR. BACHMANN: No, sir.

THE COURT: Thank you. Step down.

N.T. 452–56.

The majority states that the judge's questions were "neutral," "did not reveal manifest bias," and were not asked in a "hostile" or "challenging" manner. Majority Op. at 216. I am unable to join in these statements. I submit that no one on the jury could have had the least doubt that the

judge regarded appellant's testimony with incredulity and disdain.

English judges may, and often do, manifest their disbelief of a witness's testimony, including the defendant's. *See* Wigmore on Evidence §§ 784, 2551, 2551a (Chadbourn Revision 1970). But, partly because of the colonists' experience with His Majesty's judges, *id.*, our tradition is different. Thus our Supreme Court has said:

> Witnesses should be interrogated by the judge only when he conceives the interest of justice so requires. It is better to permit counsel to bring out the evidence and clear up disputed points on cross-examination unaided by the court; but where an important fact is indefinite or a disputed point needs to be clarified, the court may see that it is done by taking part in the examination. The practice of a judge entering into the trial of a case as an advocate is emphatically disapproved. The judge occupies an exalted and dignified position; he is the one person to whom the jury, with rare exceptions, looks for guidance, and from whom the litigants expect absolute impartiality. An expression indicative of favor or condemnation is quickly reflected in the jury box and at the counsel table. To depart from the clear line of duty through questions, expressions or conduct, contravenes the orderly administration of justice. It has a tendency to take from one of the parties the right to a fair and impartial trial, as guaranteed under our system of jurisprudence. Judges should refrain from extended examination of witnesses; they should not, during the trial, indicate an opinion on the merits, a doubt as to the witnesses's credibility, or do anything to indicate a leaning to one side or the other, without explaining to the jury that all these matters are for them.

*Commonwealth v. Myma,* 278 Pa. 505, 508, 123 A. 486, 487 (1924).

Moreover, "[t]he fact that it was the defendant himself in the present case who was the target of the judge's incredulity serves only to magnify the potential harmful effect upon

the jury." *Commonwealth v. Williams,* 468 Pa. 453, 464, 364 A.2d 281, 287 (1976). *See also Commonwealth v. Ramirez,* 269 Pa.Super. 601, 410 A.2d 863 (1979) (trial counsel ineffective for not pursuing claim in post-verdict motions where trial judge's questions to defendant manifested disbelief of defendant's testimony regarding self-defense); *Commonwealth v. Toombs,* 269 Pa.Super. 256, 409 A.2d 876 (1979) (defendant entitled to new trial where judge's remarks concerning defense witness's testimony manifested disbelief of testimony and prejudice was confirmed by judge's questioning of alibi witness and of defendant that also manifested disbelief of their testimony).

The majority relies on the fact that the judge gave a cautionary instruction before he began questioning appellant. Majority Op. at 213. Before questioning appellant, the judge stated:

> THE COURT: I have a few questions. Again, ladies and gentlemen of the jury, my questions do not reflect any opinion on my part about the guilt or innocence of the defendant or any other disputed question. They are simply asked for the purpose of clarifying some matters that have been injected into this case at this particular stage.
>
> N.T. 446.

Whatever effect this remark may have had was undone by what followed. The majority's acknowledgment that the judge's questions were "repetitious", Majority Op. at 1301, is, I submit, inadequate. The questions were not simply repetitious; by doing no more than cover ground already thoroughly explored by the assistant district attorney's extensive cross-examination of appellant, the questions served only to reemphasize the weaknesses in appellant's testimony; they "clarif[ied]" nothing except the judge's attitude towards appellant's defense.

Nor may it be maintained that the judge's "depart[ure] from the clear line of duty", *Commonwealth v. Myma, supra,* was harmless. One can have no doubt that the judge's manifestation of disbelief of appellant's testimony

was "quickly reflected in the jury box." *Id.* *And see Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978).

I should reverse the judgment of sentence and remand for a new trial.[1]

BROSKY, J., joined in this dissenting opinion.

---

1. Because I believe that appellant is entitled to a new trial solely on the ground that the judge's questioning of appellant constituted an abuse of discretion, I express no view on the remainder of appellant's arguments.